Christopher E. Hawk, OSB # 061635
chawk@gordonrees.com
Daniel J. Nichols, OSB #101304
dnichols@gordonrees.com
Kjersten Turpen, OSB # 025920
kturpen@gordonrees.com
Gordon & Rees LLP
121 SW Morrison St., Suite 1575
Portland, OR  97204
Telephone:  (503) 222-1075
Facsimile:  (503) 616-3600

Attorneys for Defendant
Goldstar Estate Buyers Corporation

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **KELLY KELSEY, CHRISTINE KOTROUS, LINDA NOONAN, CHRISTINE OTTENS, RITA ROBERTSON, KARYN SUGGS and SHERRY WICKLER,**<br><br>Plaintiffs,<br><br>vs.<br><br>**GOLDSTAR ESTATE BUYERS CORPORATION, a Minnesota corporation, and WILLIAM ULRICH, an individual,**<br><br>Defendants. | Case No.  13-cv-00354-HU<br><br>**DEFENDANT GOLDSTAR ESTATE BUYERS CORPORATION'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM IN SUPPORT**<br><br>**Fed. R. Civ. P. 12(b)(6)**<br><br>Request for Oral Argument |

**TABLE OF CONTENTS**

**Page No.**

I.  INTRODUCTION ........................................................................................................3

II.  LEGAL STANDARD FOR MOTION TO DISMISS .................................................3

III.  ALLEGATIONS ........................................................................................................5

    A.  Parties and genesis of dispute ..........................................................................5

        1.  Plaintiff Kelsey ....................................................................................5

        2.  Plaintiff Noonan ..................................................................................7

        3.  Plaintiff Robertson ..............................................................................7

        4.  Plaintiff Suggs.....................................................................................8

        5.  Plaintiff Wickler..................................................................................9

        6.  Plaintiff Kotrous..................................................................................9

        7.  Plaintiff Ottens ..................................................................................10

IV.  ARGUMENT ...........................................................................................................11

    A.  Claims 1-2: Plaintiffs' state law claims under ORS 30.867 require .....................11

    B.  Claims 3-4: Plaintiffs' federal law claims require force or serious threat of harm to obtain forced labor ................................................................................11

        1.  The purpose and history of the TVPA .........................................13

        2.  Applications of the TVPA .............................................................14

    C.  Plaintiffs cannot state claims under the TVPA or ORS 30.867 ............................17

        1.  Plaintiff Kelsey cannot state a claim for involuntary/forced labor ...........18

        2.  Plaintiff Noonan cannot state a claim for involuntary/forced labor .........20

        3.  Plaintiff Kotrous cannot state a claim for involuntary/forced labor .........20

        4.  Plaintiff Ottens cannot state a claim for involuntary/forced labor............21

        5.  Plaintiff Robertson cannot state a claim for involuntary/forced labor ........................................................................................................21

        6.  Plaintiff Suggs cannot state a claim for involuntary/forced labor ............22

        7.  Plaintiff Wickler cannot state a claim for involuntary/forced labor .........22

    D.  Plaintiffs' negligence claims are precluded by the Workers' Compensation exclusivity clause. ........................................................................................22

i

# <u>TABLE OF CONTENTS</u>

**Page No.**

E.    In the alternative, certain Plaintiffs' claims for negligence must be dismissed..................................................................................................24

    1.    Five Plaintiffs cannot recover non-economic damages under a negligence theory. ...............................................................................24

    2.    Five Plaintiffs cannot recover economic losses under a negligence theory. ................................................................................................25

V.    CONCLUSION....................................................................................................26

## TABLE OF AUTHORITIES

Page No.

**Cases**

*Adhikari v. Daoud & Partners*
   697 F. Supp. 2d 674 (S.D. Tex. 2009) ............................................................ 15, 18

*Alvarado v. Universidad Carlos Albizu (Carlos Albizu Univ.), Inc.*
   2010 U.S. Dist. LEXIS 87662 (S.D. Fla. Aug. 25, 2010) ....................................... 16

*Andersen v. Atl. Recording Corp.*
   2010 U.S. Dist. LEXIS 44168 (D. Or. 2010) ........................................................ 24

*Ashcroft v. Iqbal*
   556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ............................... 4

*Bell Atlantic Corp. v. Twombly*
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................................ 4

*Chouinard v. Health Ventures,*
   179 Or. App. 507, 515, 39 P.3d 951, 955 (2002) .................................................... 25

*Conway v. Pacific University*
   324 Or. 231, 236 (1996) ....................................................................................... 26

*Hanson v. Versarail Systems, Inc.*
   175 Or. App. 92, 95-6, 28 P3d 626 (2001) ............................................................ 23

*Harris v. Suniga*
   344 Ore. 301 (2008) ............................................................................................. 25

*Headley v. Church of Scientology Int'l*
   687 F.3d 1173 (9th Cir. 2012) ........................................................ 14, 15, 17, 20

*McFarlin v. Gormley*
   2008 U.S. Dist. LEXIS 10541 (D. Or. 2008) .................................................... 25, 26

*Moss v. U.S. Secret Service*
   572 F.3d 962 (9th Cir. 2009) .................................................................................. 4

*Numrich v. Ntekpere*
   Case No. 12-cv-1594-HU, 2013 U.S. Dist LEXIS 14792 (D. Or. 2013) ............... 25, 26

*Pearson v. Reynolds Sch. Dist. #7*
   03:12-cv-01146-HU, 2013 U.S. Dist. LEXIS 185436 (D. Or. 2013) .................... 23, 25

*Simons v. Beard,*
   188 Or. App. 370, 376, 72 P.3d 96, 100 (2003) .................................................... 25

*United States v. Dann*
   652 F.3d 1160, 1170 (9th Cir. 2011) ............................................................... 15, 17

iii

## TABLE OF AUTHORITIES

Page No.

*United States v. Todd*
    627 F.3d 329 (9th Cir. 2010) ................................................................. 13

*Velez v. Sanchez*
    693 F.3d 308 (2d Cir. 2012) ........................................................... 14, 17

*Von Heeder v. Safeway*
    2001 U.S. Dist. LEXIS 19681, 169 LRRM 2121 (D.Or. 2001) ............................. 23

*Wilson v. Tobiassen*
    97 Or. App. 527 (1989).................................................................. 25

**Statutes**

18 United States Code Section 1589........................................... 12, 13, 15, 17

18 United States Code Section 1591................................................... 12

18 United States Code Section 1595........................................... 2, 12, 13

42 United States Code Section 2000e.................................................. 26

77 Pennsylvania Statutes Section 481................................................. 23

85 Oklahoma Statutes Section 302 ................................................... 23

Arizona Revised Statutes Section 23-906............................................. 23

California Labor Code Section 3602 ................................................. 22

Oregon Revised Statute Section 163.263............................................. 11

Oregon Revised Statute Section 163.266............................................. 11

Oregon Revised Statute Section 656.018............................................. 22

Oregon Revised Statute Section 659A.030............................................ 26

Oregon Revised Statutes Section 30.867 ....................................... 2, 11, 17

Trafficking Victim Protection Act Pub. L. No. 106-386
    Section 101, 114 Stat. 1464 (2000)......................................... 13, 14, 17

Trafficking Victim Protection Reauthorization Act 106 Pub. L. 386
    Section 4 (2003)...................................................................... 14

**Rules**

Federal Rule of Civil Procedure 12 ........................................... 2, 3, 4

## LR 7-1 CERTIFICATION

Pursuant to LR 7-1 (a), the parties attempted to resolve this dispute in good faith through telephone conferences and email correspondence, but were unable to do so without court assistance.

## MOTION

Defendant Goldstar Estate Buyers Corporation ("Goldstar") moves to dismiss Plaintiff's claims 1-4 and 7 on the following grounds.

**1.      As to Claims 1-4 (Involuntary Servitude – ORS 30.867; Trafficking in Persons – ORS 30.867; Sex Trafficking – 18 USC § 1595; Forced Labor – 18 USC § 1595) by all Plaintiffs:**[1] Plaintiffs fail to state claims upon which relief may be granted (Fed. R. Civ. Pro. 12(b)(6)) because Plaintiffs do not state plausible claims for forced labor, involuntary servitude, or sex trafficking. Threats of unemployment cannot satisfy the necessary elements of "coercion" or "force." Further, none of the force alleged by Plaintiffs was used to enslave Plaintiffs.

**2.      As to Claim 7 (Negligence) by all Plaintiffs:** Plaintiffs fail to state claims upon which relief may be granted (Fed. R. Civ. Pro. 12(b)(6)) because Plaintiffs' claims for negligent acts by their employer are barred by the workers compensation liability bar.

**3.      In the alternative, as to Claim 7 (Negligence) by Plaintiffs Kelsey, Noonan, Roberston, Suggs, and Wickler**: Plaintiffs fail to state claims upon which relief may be granted (Fed. R. Civ. Pro. 12(b)(6)) because they cannot recover under a negligence claim because they have not alleged the threshold requirement of a physical injury.

This motion is supported by the accompanying Memorandum, and the record before the court.

---

[1] Plaintiff Noonan does not assert any claim under 18 USC § 1595 for forced labor.

Page 2–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

<u>MEMORANDUM</u>

## I.    INTRODUCTION

Plaintiffs' first four claims for human trafficking and forced labor/involuntary servitude must be dismissed with prejudice. Following the Court's Order granting Defendants' earlier motion to dismiss (Doc. 36), Plaintiffs have now demonstrated that they cannot state a plausible claim. In their Second Amended Complaint (Doc. 40), Plaintiffs attempt to state sexual harassment claims. However, Plaintiffs overreach by attempting to couch their employment-related harassment claim as something far more serious: human sex trafficking. Plaintiffs utterly fail to state a plausible case for forced labor or sex trafficking for the simple reason that Plaintiffs do not claim that any of the alleged violence, harassment, or terrible working conditions were used to keep Plaintiffs employed at Goldstar. Indeed, Plaintiffs allege the opposite; they allege that the threat of unemployment convinced them to stay in an allegedly hellish working environment. Plaintiffs have simply not alleged a case of modern-day slavery.

In addition, Plaintiffs' claims for negligence should be dismissed with prejudice. First, they are barred by the Workers Compensation exclusivity bar. In the alternative, Plaintiffs Kelsey, Noonan, Robertson, Suggs, and Wickler cannot bring claims in negligence for emotional distress or economic loss because they have not alleged a physical injury.

## II.    LEGAL STANDARD FOR MOTION TO DISMISS

This Court summarized the standards for motion to dismiss while granting Defendants' earlier motion to dismiss in this case. Doc. 36;  *Kelsey v. Goldstar Estate Buyers Corp.*, 2014 U.S. Dist. LEXIS 37361, * 5-7 (D. Or. Mar. 21, 2014):

> A court may dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, the court must accept all of the claimant's material factual allegations as true and view all facts in the light most favorable to the claimant. [Citation]. The Supreme Court addressed the proper pleading standard under Rule 12(b)(6) in

Page 3–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). *Twombly* established the need to include facts sufficient in the pleadings to give proper notice of the claim and its basis: "While a complaint attacked [under] Rule 12(b)(6) . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (brackets omitted).

Since *Twombly*, the Supreme Court has clarified that the pleading standard announced therein is generally applicable to all cases governed by the Rules, not only to antitrust cases. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). The *Iqbal* court explained that *Twombly* was guided by two specific principles. First, although the court must accept as true all facts asserted in a pleading, it need not accept as true any legal conclusion set forth in a pleading. *Id*. Second, the complaint must set forth facts supporting a plausible claim for relief and not merely a possible claim for relief. *Id.* The court instructed that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50 [citation]. The court concluded: "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 1950.

The Ninth Circuit further explained the *Twombly-Iqbal* standard in *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009). The Moss court reaffirmed the *Iqbal* holding that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Moss*, 572 F.3d at 969 (quoting *Iqbal*, 129 S. Ct. at 1949). The court in *Moss* concluded by stating: "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inference from that content must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*, 572 F.3d at 969.

In evaluating Plaintiffs' claims, the Court may ignore unsupported conclusions in Plaintiffs' complaint and only consider well-pleaded facts. Thus, the Court can disregard paragraphs 5, 6, and 7 in their entirety because they suffer the same defect that prompted Defendants to file the initial motion to dismiss. General allegations such as "Defendants subjected each plaintiff to unlawful sex-based conduct" cannot support Plaintiffs' individual claims. Further, amalgamated allegations that mix-and-match individual Plaintiffs' claims should be disregarded. For example, Plaintiffs allege, generally, that they were "variously raped,

assaulted, drugged [etc.]" SAC ¶ 6. However, only Plaintiff Ottens actually alleges (on information and belief) that she was drugged (SAC ¶ 37) and only Ottens and Kotrous allege specific facts relating to sexual assault (SAC ¶¶ 21, 37).

Finally, the Court should ignore the speculative and unsupported general allegations regarding fear of Defendant Ulrich contained in paragraph 6 of the Second Amended Complaint. Plaintiffs offer no well-pleaded facts to support the vague allusions to their "fear[] of Defendant Ulrich and his capacity for malice and revenge," only general references to "stories" about Ulrich. SAC ¶ 6. Turning to the facts properly alleged by Plaintiffs:

### III.    ALLEGATIONS[2]

**A.    Parties and genesis of dispute**

The disputes of the seven Plaintiffs stem from their employment at Defendant Goldstar and their work with Defendant Mr. Ulrich, a Goldstar executive. Plaintiffs are former employees of Defendant Goldstar, who worked at various times, in various locations around the United States, between September 2004 through November 2012. Second Amended Complaint (SAC) at ¶¶ 8, 19, 30, 36, 41, 48, 58. Goldstar is a buyer and seller of jewelry and other valuable items. SAC at ¶ 3. As part of that business, Goldstar employees regularly traveled to various cities around the country. SAC at ¶ 3. Plaintiffs' periods of employment ranged from a few days (Ms. Noonan) to several months (Ms. Kelsey) to nearly eight years (Ms. Wickler). SAC at ¶¶ 8, 30, 58.

#### 1.    *Plaintiff Kelsey*

Plaintiff Kelsey worked at Goldstar from January to November 2011. SAC ¶ 8. According to Kelsey, Defendant Ulrich "sexually harassed and demeaned" Kelsey by: making

---

[2] While not relevant for this motion, it bears noting the Defendants vigorously deny Plaintiffs' allegations. Defendant Goldstar has refrained from repeating "allegedly" in front of every factual allegation described below. This is not a concession that any of the allegations are true or have any merit whatsoever.

suggestive comments, inviting Kelsey on dates, winking and smirking at her, touching her thigh, watching Kelsey move items around an office, asking about her whereabouts at odd hours, drunk-calling her, and propositioning her for sex in exchange for money. SAC ¶¶ 8-18. The specific incidents of harassment that Kelsey alleges can be summarized as follows:

- Shortly after starting employment, Ulrich, through Donna Elliott, invited Kelsey to a personal dinner, which Kelsey apparently declined. SAC ¶ 10.

- Ulrich invited Kelsey to join him and another woman at his dinner table, who Kelsey describes as a "prostitute." After some suggestive conversation, Plaintiff declined an invitation to join Ulrich and the woman in their hotel room. SAC ¶ 11.

- Kelsey intervened after Ulrich allegedly offered an off-duty female police officer money to come to his hotel room. SAC ¶ 12.

- On various (unidentified) occasions, Ulrich inquired about Kelsey's whereabouts and activities. SAC ¶ 13.

- On (unidentified) occasions, Ulrich "press[ed] his body against" Kelsey and "ben[t] in close and tr[ied] to kiss" her. SAC ¶ 14.

- Kelsey delivered alcohol to Ulrich's hotel room and watched Ulrich have sex. SAC ¶ 15. On one occasion, Ulrich answered the door naked and handcuffed, and Kelsey declined Ulrich's invitation to join him and another woman. *Id.*

- Kelsey arranged travel and lodging for "various women, including prostitutes." SAC ¶ 16. According to Kelsey, she assisted in transporting an apparently underage girl brought by an alleged prostitute. SAC ¶ 16.

- Near the end of her employment, Ulrich again propositioned Kelsey to be his girlfriend. SAC ¶ 17. She came to his hotel room, where Ulrich "requested a kiss" and attempted to

follow her into the bathroom. SAC ¶ 17. Ulrich's shirt caught on fire, Kelsey put it out

with water, and Kelsey ran away. SAC ¶ 17.

Kelsey does not allege that she was forced to remain employed at Goldstar.

### 2.      *Plaintiff Noonan*

Plaintiff Noonan worked for Goldstar for a few days in May 2011. According to her

allegations, she arrived hungry at her first jewelry buying show, and "before she could eat,

Defendant Ulrich insisted on ordering her alcoholic drinks." SAC ¶ 31. Noonan does not allege

what force or threat of force, if any, Ulrich used to postpone Noonan's meal until after drinks

were consumed. SAC ¶ 31.

Noonan alleges that Ulrich propositioned her for sex, "canceling everyone's dinner

order" when she declined. SAC ¶ 32. Noonan does not allege what force or threat of force, if

any, was employed to postpone her dinner until later that evening. SAC ¶¶ 32-33. Ulrich again

propositioned her for sex through her first show; and Noonan refused. SAC ¶¶ 33-35. According

to Noonan, this resulted in termination of her employment. SAC ¶ 35.

Noonan does not allege that she was forced to remain employed with Goldstar. Indeed,

she claims that she "got down on her knees and begged Defendant Ulrich to let her keep her

job." SAC ¶ 33.

### 3.      *Plaintiff Robertson*

Plaintiff Robertson worked for Goldstar for nearly three years (from September 2009 to

June 2012). SAC ¶ 41. According to Robertson, Ulrich made "unwelcome sexual advances

towards [her] almost every day they were together." SAC ¶ 42. More specifically, Robertson

asserts that Ulrich:

- sat close to her and rubbed against her while she worked (SAC ¶ 42);

- ordered Robertson to watch Ulrich have sex with a prostitute (SAC ¶ 43);

Page 7–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

- repeatedly called Robertson's cell phone (SAC ¶ 44);

- attempted (and failed) to enter Robertson's hotel room without her permission (SAC ¶ 44); and

- unsuccessfully propositioned Robertson for sex. (SAC ¶¶ 46-47)

Robertson does not allege that she was compelled to remain employed. Rather, the only threats of "force" described by Robertson were threats to her employment. SAC ¶ 43 ("threatened to fire her") ("Ulrich would threaten to send her home the next morning").

### 4. *Plaintiff Suggs*

Plaintiff Suggs worked for Goldstar for more than a year, from February 2011 through June 2012. SAC ¶ 48. She complains that she "witnessed [Ulrich] grabbing and groping female co-workers, hotel and bar staff, and prostitutes." SAC ¶ 49. According to Suggs, Ulrich propositioned her for sex on several occasions, including their first meeting; and Suggs declined. SAC ¶¶ 50-51, 53. Ulrich asked Suggs to find him a "road girlfriend," and Suggs initially attempted to satisfy his request. SAC ¶ 52. On one occasion, Ulrich invited Suggs to "his room for a private talk," upon which Ulrich asked to see Suggs' breasts. SAC ¶ 56. Suggs complied with the request, fearing that she "would lose her job" if she did not comply. SAC ¶ 56. Ulrich touched her breasts, and Suggs left the room. SAC ¶ 56.

Suggs does not allege that she was compelled to remain employed. Instead, the only threat of force specifically alleged by Suggs was the fear of losing her employment. See, e.g., SAC ¶ 56. The final conversation alleged by Suggs underlines this point:

> Plaintiff Suggs was shocked and upset and asked Defendant Ulrich "So, if I have sex with you, my job will be secure?" Defendant Ulrich replied, "Yes."

SAC ¶ 57. According to Suggs, she did not have sex with Ulrich (or anyone else at Goldstar).

### 5.  *Plaintiff Wickler*

Plaintiff Wickler worked for Goldstar for nearly eight years, from September 2004 to June 2012. SAC ¶ 58. Accordingly to Wickler, she was sexually harassed by Ulrich from her "first week of employment." SAC ¶ 59. Throughout her employment, Ulrich repeatedly propositioned Wickler for sex with him and others. SAC ¶¶ 58-66. Wickler apparently had a sexual relationship with Ulrich from at least 2004. SAC ¶ 59.

Wickler blames Ulrich for her marriage dissolving in 2008. SAC ¶ 61. Wickler felt pressured to find Ulrich other sexual partners "or she would be fired." SAC ¶ 61. According to Wickler, Ulrich at one point removed her chair, forcing her to stand during her shift until she obtained another chair (which he then took). SAC ¶ 65.

Wickler also asserts that Ulrich would "verbally abuse" her and "throw objects, such as chairs, around the room if she resisted his sexual advances." SAC ¶ 59. She does not allege that Ulrich made any threats to keep her employed at Goldstar. Indeed, Wickler feared that if she did not comply with his requests, he would fire her. SAC ¶ 59.

### 6.  *Plaintiff Kotrous*

Plaintiff Kotrous worked for Goldstar for a year and a half, from March 2011 to November 2012. SAC ¶ 19. Kotrous concedes that she and Ulrich had a sexual relationship, which she characterizes as "maintained through violence and coercion." SAC ¶ 20. Kotrous alleges numerous incidents of sexual assault. SAC ¶¶ 20-29.

Kotrous was "fired" nine times from employment at Goldstar (and apparently re-hired eight times). SAC ¶ 22. She also claims that Ulrich required her to "drink alcohol to the point of illness," though she does not allege how he forced her to drink. SAC ¶ 26.

Unlike all of the other Plaintiffs except Ottens, Kotrous alleges that she was sexually assaulted by Ulrich on various occasions. However, she does not allege that she was forced to

remain employed by Goldstar. That is, Kotrous does not allege that Ulrich assaulted her in order to compel Kotrous to continue working for Goldstar (or Ulrich). Indeed, Kotrous insists that her employment was continually threatened—and frequently terminated—when she did not give in to Ulrich's advances. SAC ¶¶ 22, 27-29.

### 7.   *Plaintiff Ottens*

Plaintiff Ottens worked for Goldstar first in 2008 for three months (January to March 2008) and later for more than a year, from April 2011 to June 2012. SAC ¶ 36. Ottens claims that during her first period of employment, Ulrich drugged her and sexually assaulted her, resulting in Ottens quitting her job. SAC ¶ 37.

Before Ottens returned to work in 2011, she understood her employment was premised on engaging in a consensual sexual relationship with him, i.e. becoming his "girlfriend." SAC ¶ 38. Ottens accepted the arrangement. SAC ¶ 38. While Ottens alleges that Ulrich "controlled all aspects" of her life while on the road, including her "food, lodging, television," etc., she does not allege how Ulrich maintained that control other than threatening "to have Defendant Goldstar fire her and/or send her home if she resisted his advances." SAC ¶ 39. According to her, Ottens accepted her sexual relationship with Ulrich in order to obtain employment. SAC ¶ 38.

Like Kotrous, Ottens asserts that Ulrich sexually assaulted her. SAC ¶ 40. And like Kotrous, Ottens does not allege that Ulrich's assaults were directed at forcing Ottens to remain employed. Indeed, Ottens understood that her employment would end if she refused Ulrich's advances. SAC ¶ 39.

## IV.   ARGUMENT

**A.    Claims 1-2: Plaintiffs' state law claims under ORS 30.867 require "involuntary servitude"**

The essential element at Plaintiffs' state law claims under ORS 30.867 is involuntary

servitude, *i.e.* being forced to work against one's will. That statute provides, in relevant part:

> Irrespective of any criminal prosecution or the result of a criminal prosecution, a person injured by a violation of ORS 163.263 (Subjecting another person to involuntary servitude in the second degree) . . . or [ORS] 163.266 (Trafficking in persons) may bring a civil action for damages against a person whose actions are unlawful under [those statutes].

Or. Rev. Stat. § 30.867(1). Under ORS 163.263:

> A person commits the crime of subjecting another person to **involuntary servitude** . . . if the person knowingly and without lawful authority forces or attempts to **force the other person to engage in service**s by [among other things] [i]nstilling in the other person a fear that the actor will withhold from the other person the necessities of life, including but not limited to lodging, food and clothing.

(bold added). The trafficking statute (Plaintiffs' Claim 2), ORS 163.266, similarly provides:

> A person commits the crime of **trafficking** in persons if the person knowingly: (a) Recruits, entices, harbors, transports, provides or obtains by any means, or attempts to recruit, entice, harbor, transport, provide or obtain by any means, another person knowing that the other person will be **subjected to involuntary servitude** as described in ORS 163.263 . . . or (b) Benefits financially or receives something of value from participation in a venture that involves an act prohibited by this section or ORS 163.263[.]

(bold added).

**B.    Claims 3-4: Plaintiffs' federal law claims require force or serious threat of harm to obtain forced labor**

Plaintiffs' third and fourth causes of action, which are predicated on allegations of forced

labor and sex trafficking, are brought pursuant to the Trafficking Victims Protection Act's

(TVPA) civil remedy provision.

An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything

Page 11–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). The federal forced labor statute provides:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means——(1) by means of **force**, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of **serious harm** or threats of serious harm to that person or another person; (3) by means of the abuse or threatened **abuse of law** or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer **serious harm or physical restraint**, shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a) (bold added). Section 1589(c) includes the following definitions:

> (1) The term 'abuse or threatened **abuse of law** or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

> (2) The term '**serious harm**' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

(bold added). The federal sex trafficking statute provides:

> Whoever knowingly (1) in or affecting interstate commerce . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or in reckless disregard of the fact, that means of **force, threats of force, fraud, coercion** . . . or any combination of such means will be used to cause the person to engage in a **commercial sex act**, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a) (bold added).

Section 1591(e) includes the following definitions:

(1) The term 'abuse or threatened **abuse of law** or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2) The term '**coercion**' means: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process.

(3) The term '**commercial sex act**' means any sex act, on account of which anything of value is given to or received by any person.

(4) The term '**serious harm**' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

18 U.S.C. § 1589(c) (bold added).

### 1.    *The purpose and history of the TVPA*

In 2000, Congress passed the TVPA. Pub. L. No. 106-386, § 101, 114 Stat. 1464 (2000). Congress did so in order to "combat trafficking in person, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id*. at § 202. The Act is intended to combat the scourge of forced human trafficking. *See United States v. Todd*, 627 F.3d 329, 335 (9th Cir. 2010) (Smith, J., concurring) ("Where a defendant engages in sex trafficking without the use of force, fraud, or coercion, or where children are not involved, his conduct is criminalized by a different set of statutes.").

Among other findings, Congress found that:

- "As the 21st Century begins, the degrading institution of slavery continues throughout the world. Trafficking in persons is a modern form of slavery …"

- "Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion."

- "Traffickers often make representations to their victims that physical harm may occur to them or others should the victim escape or attempt to escape."

Pub. L. No. 106-386, § 103(b).

In 2003, Congress amended the TVPA to permit civil suits by victims of trafficking. Trafficking Victim Protection Reauthorization Act (TVPRA) 106 Pub. L. 386, § 4(a)(4) (2003). The statute was later amended to expand the scope of civil remedies to apply to claims of forced labor. *See Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) ("amending the civil cause of action to remove references to specific crimes and therefore expanding its scope to include forced labor," citing Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (2008)).

### 2.    *Applications of the TVPA*

In application, courts have been mindful of the anti-slavery purpose of the TVPA. The Ninth Circuit in *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1175 (9th Cir. 2012) affirmed summary adjudication of TVPA claims where the working environment was hellish, but the workers could leave.

In *Headley*, the plaintiffs were former adherents of Scientology and former members of the Sea Org, an organization within the church. While members of the Sea Org, the plaintiffs' lifestyles were severely constrained, including adherence to strict policies regarding outside communications, marriage, and even procreative choices. 687 F.3d 1173, 1175. Further, the

Page 14–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

plaintiffs worked "long, hard hours without material compensation." *Id.* The plaintiffs also experienced and observed reprimands and physical abuse while in the Sea Org. *Id*. at 1176.

Nevertheless, the court in *Headley* affirmed dismissal of their claims. The court noted that the plaintiffs "had innumerable opportunities to leave the Church." 687 F.3d 1173, 1176. They lived outside of the Sea Org compound and traveled freely to and from it. *Id*. The plaintiffs had access to vehicles and to phones and the Internet. Further, the court noted that other Scientologists had successfully left the Sea Org, and the plaintiffs successfully left on their first attempt to leave. 687 F.3d 1173, 1177.

While acknowledging the evidence of physical and psychological abuses of Sea Org life, the court emphasized that the plaintiffs could leave. 687 F.3d 1173, 1180. And while the Church warned of the social and membership consequences of leaving the Sea Org, the court held that this was insufficient to constitute psychological coercion. *Id*.

The *Headley* Court explained that the TVPA "bars an employer from obtaining another's labor '**by means of**' force, physical restraint, serious harm, threats, or an improper scheme." 687 F.3d 1173, 1179, bold added, citing 18 U.S.C. § 1589(a)(1), (a)(2), (a)(4). The severities of the Sea Org lifestyle were incident to membership, rather than employed to "obtain [the plaintiffs'] labor." 687 F.3d 1173, 1179. In other words, the plaintiffs had not shown, as the Act required, that "serious harm" would befall them if they "did not continue to work" or that threats compelled them "to remain with the employer." *Id.* at 1180, *quoting United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011), brackets and emphasis omitted.

By contrast, the court in *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674 (S.D. Tex. 2009) held that immigrant workers held against their will could state a claim under the TVPA. In *Adhikari*, Nepali nationals were promised work at a Jordanian hotel. However, when they arrived in Jordan, their passports were taken away and they were held in a dark room. *Id*. at 684-685.

Page 15–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

They were then loaded onto trucks—over their protests—and driven into Iraq without security. After entering Iraq, the workers were captured by insurgents and subsequently executed. The court held that these facts were sufficient to state a claim for trafficking under the TVPA. After they were stranded in a foreign county without their passports and without means of returning home, they had no reasonable choice but to be victims of human trafficking.

On the other hand, not every violation of employment or immigration law will support a claim for forced labor or human trafficking. *See Alvarado v. Universidad Carlos Albizu (Carlos Albizu Univ.), Inc*., 2010 U.S. Dist. LEXIS 87662 (S.D. Fla. Aug. 25, 2010). In *Alvarado*, a foreign national was brought to the United States to teach at a university. After he arrived, he was given additional responsibility outside his contract. He claimed that the University violated immigration regulations and threatened to terminate him, in violation of employment laws. The court rejected his claim, holding that "Alvarado was not trafficked to the United States, he earned a healthy salary, and enjoyed the same freedoms and rights of employment as any other alien resident." *Id.* at *11. "If the University had terminated his employment, as [the plaintiff] claims it threatened, he was free to seek employment with another employer or to leave the United States. If he is wrongfully terminated, [the plaintiff] has adequate remedies…." *Id*. at *11. The court held that the plaintiff was "similarly situated to every other United States worker who has been asked to take over responsibilities not explicitly mentioned in his job description." *Id*. at *12. In sum, not every violation of immigration or employment law can rise to the "serious harm" necessary to state a claim for human trafficking.

In the criminal law context, the Ninth Circuit likewise limits the application of the TVPA to circumstances where the claimant is forced to labor. "[S]omeone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm — physical or nonphysical, including psychological, financial,

reputation harm — that would compel someone in her circumstances to continue working to avoid that harm." *United States v. Dann*, 652 F.3d 1160, 1169-1170 (9th Cir. 2011). "To be sure, not all bad employer-employee relationships … will constitute forced labor." *Dann*, 652 F.3d 1160, 1170. Rather, "the threat of harm must be serious," i.e. "sufficiently serious to compel that person to remain. *Id*., citing 18 U.S.C. § 1589(c)(2). The critical distinction between a slave and an abused employee is the ability to leave. In short, slaves are not fired; they are not sent home early; and they are not threatened with unemployment if they do not perform.

## C.    Plaintiffs cannot state claims under the TVPA or ORS 30.867

All of Plaintiffs' first four claims[3] fail for the simple reason that they do not allege they were forced to perform services, as that force is defined by the relevant statutes. Both the state and federal statutes require, as a threshold element, involuntary or forced labor.[4] Plaintiffs allege a staggering amount of sexual harassment and, as to two Plaintiffs, sexual assault. But at no point do any of the Plaintiffs allege that Ulrich (or Goldstar) prevented them from leaving what they describe as a hellish working environment. Thus, like the plaintiffs in the *Headley* matter, Plaintiffs "had innumerable opportunities to leave" their employment. *See* 687 F.3d 1173, 1176. As the court in *Headley* stressed, forced labor consists of "obtaining another's labor 'by means of' force, physical restraint, serious harm, threats, or an improper scheme.'" 687 F.3d 1173, 1179. A terrible—even dangerous—work environment is not slavery so long as the force or threats are not used to hold the worker in that environment against their will. Not one of the Plaintiffs has alleged "that serious harm [would] befall [her] 'if she did not continue to work' or a threat that 'compel[led] her to remain' with the employer." *See id.* at 1180.

---

[3] All Plaintiffs asserts Claims 1-3, and all Plaintiffs except Noonan assert Claim 4.
[4] Involuntary servitude and forced labor are essentially interchangeable terms used to describe modern-day slavery. *Cf. Velez v. Sanchez*, 693 F.3d 308, 320, fn. 8 (2d Cir. 2012) (as to "claims of involuntary servitude and forced labor, these terms are frequently used interchangeably, and the concepts overlap").

1.      **Plaintiff Kelsey cannot state a claim for involuntary/forced labor**

Plaintiff Kelsey alleges that Ulrich "forced" her to observe or assist in Ulrich's sexual activities with other women. SAC ¶¶ 8-18. However, the only "force" specifically alleged by Kelsey is the fear that if she did not comply with Ulrich's requests, she would lose her job. For example, Kelsey complains that she was "forced" to intervene when Ulrich allegedly propositioned an off-duty police officer, but she "intervene[ed] to save the Goldstar show." SAC ¶ 12. Kelsey may have felt obligated as an employee to assist her boss, but that is not the kind of force the statutes address.

Plaintiff Kelsey does not allege facts to support a claim for human sex trafficking for herself. In one of the more disturbing allegations, Kelsey hints that she assisted in arranging for an underage prostitute. If true—and Defendants emphatically deny the allegations—that could lead to a claim by the young girl. But Kelsey has no claim as a willing participant.

Plaintiff Kelsey states that Defendants "forced or attempted to force [her] to engage in the services alleged herein by instilling in her a fear that … Defendants would withhold the necessities of life." SAC ¶ 70. But Kelsey does not support that legal conclusion with well-pleaded facts. Kelsey offers no facts to support her empty assertion that she was threatened with physical harm to prevent her from leaving employment. SAC ¶ 70(a). Further, Plaintiff offers no facts to support her statement that she feared being "strand[ed] in unfamiliar cities around the country." Indeed, the only references to travel in Plaintiffs' complaint are that Ulrich threatened to send them home on the next flight—not to leave them stranded. See SAC ¶¶ 24, 27, 33, 40, 43. Moreover, even if such a threat were made, Kelsey has not alleged facts sufficient to plausibly claim that such an inconvenience would threaten the "necessities of life." In other words, Kelsey does not assert that she could not leave and simply travel back home (by airplane, train, bus, or other public transit). This is utterly dissimilar to *Adhikari*; Plaintiffs were not

immigrants threatened with being stranded in a foreign country with no reasonable means of obtaining food or shelter other than their employer.

Kelsey's allegation that Defendants threatened to "withhold[] payment" (SAC ¶ 70(c)) is an employment claim, not involuntary servitude. Likewise, her complaint that Defendants "refus[ed] to provide her with food" fails to explain why such a withholding would threaten the necessities of life, as opposed to simply inconveniencing her by making her pay for her own food. SAC ¶ 70(d).

Kelsey's allegation that Defendants "restrict[ed] the time she could eat," etc. (SAC ¶ 70(e)) begs the question: how did Defendant create this restriction? The only explanation offered by Kelsey is that she feared for her job. That is not involuntary servitude.

Further, Plaintiff Kelsey offers no facts to support her conclusion that Defendants coerced her to engage in a commercial sex act by "physical restraint of Plaintiff Kelsey's person." SAC ¶ 150(b). Nowhere does Kelsey assert that she was not free to quit her job and leave.

The crux of Kelsey's claim is revealed when she alleges that the "force" used by Defendants included "threats of adverse employment action," "threats of financial harm, including loss of job security," and "unrelenting supervisory pressure." SAC ¶ 150(c), (d), (e). Kelsey does not allege a plausible claim to support a theory that "psychological abuse" kept her employed against her will. SAC ¶ 150(g).

In sum, Kelsey alleges a terrible working environment. However, she does not allege that she could not leave that environment. That is a critical distinction between harassment and slavery.

**2.      Plaintiff Noonan cannot state a claim for involuntary/forced labor**

Plaintiff Noonan identifies two allegations to support her "involuntary servitude" and trafficking claims: "evicting her from the hotel room she relied on for shelter, thereby leaving her homeless and stranded in an unfamiliar city without resources" and "refusing to allow her to eat, including denying her food when she was hungry." SAC ¶ 85. First, Plaintiff Noonan does not allege any facts supporting the conclusion that she would be left "stranded;" rather, she alleges that "Defendant Ulrich responded by threatening to fire Plaintiff Noonan and send her home the next day." SAC ¶ 33. Even if Defendants had threatened to fire and leave her in Detroit, Michigan (the only show worked by Noonan, SAC ¶ 31), she does not allege any facts to support a conclusion that this was sufficient force to compel her to perform services against her will. As to "denying her food," Plaintiff fails to identify any force used to deny her food. Rather, Defendant Ulrich apparently postponed the dinner he was paying for until after Noonan drank some alcohol. SAC ¶ 31. Nowhere does Noonan allege facts to show that she could not have obtained food on her own if she had wanted.

**3.      Plaintiff Kotrous cannot state a claim for involuntary/forced labor**

Plaintiff Kotrous alleges a hellish work environment filled with constant sexual harassment and frequent sexual assaults. SAC ¶ 21. Nevertheless, Kotrous does not allege that she was prevented from leaving Goldstar. Indeed, Kotrous was "fired" nine times and sent home on other occasions. SAC ¶¶ 22, 24, 27. She consistently returned. Like the plaintiffs in *Headley*, Kotrous was free not to return to work.

Kotrous had the ability to leave. Indeed, she left Goldstar many times. See SAC ¶ 22. More fundamentally, Kotrous does not allege that any of the alleged brutal conditions—the sexual assaults, the excessive drinking, etc.—were used to keep her employed at Goldstar. Rather, according to her, the threat of unemployment kept her employed by Goldstar.

Page 20–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

4.     **Plaintiff Ottens cannot state a claim for involuntary/forced labor**

Like Kotrous, Ottens alleges a horrific work environment in which she was sexually assaulted and agreed to act as Ulrich's girlfriend while employed at Goldstar. SAC ¶ 38. And, like Kotrous, Ottens does not allege that any of the force or threats of force alleged were used to keep her employed at Goldstar. Rather, the threat of unemployment was allegedly used to keep her working at Goldstar. SAC ¶ 38 ("she was desperate for a job").

5.     **Plaintiff Robertson cannot state a claim for involuntary/forced labor**

Plaintiff Robertson alleges that Defendants threatened her with "leaving her homeless and stranded in an unfamiliar city." SAC ¶ 100(a). As noted above, Plaintiffs have alleged no facts to support this contention. Rather, Plaintiffs allege that they were threatened with being sent home and fired. See SAC ¶¶ 24, 27, 33, 40, 43. Further, none of the Plaintiffs have alleged that even if Defendants had fired them while they were on the road they could not return home. Plaintiff Robertson also alleges that Defendants threatened to withhold "payment for legitimate services rendered." SAC ¶ 100(b). Again, that is an employment claim, not slavery.

Plaintiff Robertson offers no facts whatsoever to assert that she was physically restrained or that physical force or threats of force were used to keep her employed. SAC ¶ 174(a)-(c). The true nature of Plaintiff Robertson' complaint is revealed when she complains that she was enslaved due to "threats of adverse employment action," "loss of job security," and "unrelenting supervisory pressure." SAC ¶ 174 (d)-(g). Those are employment claims, not claims for forced labor or sex trafficking. Finally, Plaintiff Robertson has not alleged facts to support the notion that her alleged "psychological abuse" was so severe that she was compelled to continue working for Goldstar. SAC ¶ 174(g).

**6.      Plaintiff Suggs cannot state a claim for involuntary/forced labor**

Like Plaintiff Robertson, Plaintiff Suggs alleges that Defendants threatened her with

being stranded on the road and withholding pay. For the same reasons noted above, these

allegations do not state a claim for involuntary servitude. And like Plaintiff Robertson, Plaintiff

Suggs asserts the same employment-related allegations of coercion. SAC ¶ 180(a)-(c) ("threats

of adverse employment action," "loss of job security," and "unrelenting supervisory pressure").

Finally, Suggs does not allege any facts to support a claim of psychological abuse under the

statutes.

**7.      Plaintiff Wickler cannot state a claim for involuntary/forced labor**

Plaintiff Wickler alleges threats of physical violence and discomfort, including Ulrich

"throwing objects while yelling" and "forcing her to stand." SAC ¶ 116(a)-(b). Wickler does not

allege that these physical threats were used to keep her at Goldstar. The remaining allegations by

Wickler mimic the other Plaintiffs and are addressed above.

**D.      Plaintiffs' negligence claims are precluded by the Workers' Compensation
         exclusivity clause.**

Plaintiffs' negligence claims are barred on their face by the Workers' Compensation

exclusivity clause, and must therefore be dismissed. ORS 656.018 provides that

> The **liability of every employer**…is **exclusive** and in place of all other liability
> arising out of injuries, diseases, symptom complexes or similar conditions **arising
> out of and in the course of employment** that are sustained by subject workers,
> the workers' beneficiaries and anyone otherwise entitled to recover damages from
> the employer on account of such conditions or claims[.]

ORS § 656.018, bold added.[5] In other words, where a worker's injury arises out of and in the

course of employment, the worker's remedy is limited to that provided by the workers'

---

[5] Plaintiffs allege that "the acts and omissions alleged herein were committed within the District
of Oregon." SAC ¶ 1. Therefore, Oregon's workers' compensation law bars their negligence
claims. Nevertheless, even if Plaintiffs looked to the states of their alleged residence, their claims
would remain barred by similar schemes in the other states. *See* California Labor Code § 3602

Page 22–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

compensation laws. *Hanson v. Versarail Systems, Inc.,* 175 Or. App. 92, 95-6, 28 P3d 626 (2001). This court has previously agreed that negligence claims arising out of alleged sexual harassment are barred by the workers' compensation exclusivity provision. *See Von Heeder v. Safeway,* 2001 U.S. Dist. LEXIS 19681, 169 LRRM 2121 (D.Or. 2001) (agreeing that claims for negligence by female plaintiffs claiming sexual harassment during their employment with the defendant should be dismissed based on *Hanson, infra*); *see also Pearson v. Reynolds Sch. Dist. #7,* 03:12-cv-01146-HU, 2013 U.S. Dist. LEXIS 185436 (D. Or. 2013) (granting summary judgment against claim for negligent supervision as barred by the workers' compensation exclusivity clause).

Plaintiffs' negligence claims arise out of their employment, and their alleged mistreatment was suffered in the course of their employment. *See* SAC ¶ 9 ("Throughout the course of her employment with Defendant Goldstar, Defendant Ulrich sexually harassed and demeaned Kelsey frequently…"); ¶ 20 ("Defendant Ulrich sexually harassed Plaintiff Kotrous throughout her employment with Defendant Goldstar"); ¶¶ 30-35 (Noonan's allegations stem from a show she worked for Goldstar); ¶¶ 37 ("Plaintiff Ottens' first period working for Defendants ended because of Defendant Ulrich's misconduct towards her"; "Defendant Ulrich called Plaintiff Ottens and invited her to return to work for Defendants, but he conditioned employment on her also being his 'girlfriend'"); ¶ 42 ("From the beginning of her employment by Defendants, Defendant Ulrich made unwelcome sexual advances towards Plaintiff Robertson…"); ¶ 49 ("Defendant Ulrich sexually harassed Plaintiff Suggs at least twice a week throughout her time working for Defendants."); ¶ 59 ("Defendant Ulrich's sexual harassment of [Wickler] began within the first week of her employment…").

---

(a); 85 Oklahoma Statutes § 302; Arizona Revised Statutes § 23-906; 77 Pennsylvania Statutes § 481.

All of Plaintiffs' allegations of negligent injury arise out of each of their employment relationships with Goldstar. For example, Plaintiffs allege a failure to provide a safe workplace and to train, supervise, or control its employees, a failure to supervise employees, a failure to properly discipline Defendant Ulrich, a failure to terminate employees engaging in unlawful conduct, and a failure to prevent or remedy alleged harassment. *See* SAC ¶¶ 225, 231, 237, 243, 249, 255, 261. All of these allegations involve the assertion that negligence in some aspect of their employment resulted in alleged injury to Plaintiffs. As such, Plaintiffs' negligence claims are barred by the workers' compensation exclusivity provision. Thus, they must be dismissed.

**E.      In the alternative, certain[6] Plaintiffs' claims for negligence must be dismissed.**

Ordinarily, a plaintiff may not recover emotional distress damages under a negligence theory without a physical impact. *Andersen v. Atl. Recording Corp.*, 2010 U.S. Dist. LEXIS 44168, *29-30 (D. Or. 2010). Because Plaintiffs fail to allege any physical impact, they cannot assert noneconomic damages under a negligence theory, leaving them with negligence claims for purely economic damages. The economic loss doctrine bars Plaintiffs from proceeding with their negligence claims for purely economic damages. Plaintiffs therefore have no compensable damages to support their negligence claims, and those claims must be dismissed for this alternate reason.

**1.      Five Plaintiffs cannot recover non-economic damages under a negligence theory**.

Plaintiffs Kelsey, Noonan, Robertson, Suggs, and Wickler's claims for noneconomic losses must be dismissed because these Plaintiffs fail to allege they suffered any physical injury. In order to recover emotional distress damages under a negligence theory, Oregon law requires "an act or omission that results in some perceptible physical effect on a plaintiff to warrant

---

[6] In this section, Defendant moves to dismiss the claims of five of the Plaintiffs: Kelsey, Noonan, Robertson, Suggs, and Wickler. As to the remaining Plaintiffs, Kotrous and Ottens, Goldstar does not move to dismiss these negligence claims at the pleading stage on the alternate basis.

Page 24–DEFENDANT GOLDSTAR'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT

recovery of emotional distress damages." *Pearson v. Reynolds Sch. Dist*. #7, 2013 U.S. Dist. LEXIS 185436, *62 (D. Or. Nov. 18, 2013), ellipses omitted, citing *Simons v. Beard*, 188 Or. App. 370, 376, 72 P.3d 96, 100 (2003); see also *Chouinard v. Health Ventures*, 179 Or. App. 507, 515, 39 P.3d 951, 955 (2002). Not every physical touch can satisfy the physical injury rule. *Chouinard v. Health Ventures*, 179 Or App 507, 515. "At a minimum, the physical impact rule requires an act or omission that results in some perceptible physical effect on a plaintiff." *Id*.

Five Plaintiffs do not allege any physical injury that could satisfy the requirement for stating a claim for negligence resulting in emotional distress. They variously allege some level of physical touching, but nothing that can rise to the level required by the physical impact rule.[7] Therefore, these Plaintiffs do not have a valid claim for noneconomic damages under a negligence theory.

### 2. Five Plaintiffs cannot recover economic losses under a negligence theory.

Under Oregon law, "one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Harris v. Suniga*, 344 Ore. 301, 308 (2008), brackets and citation omitted. Because the five Plaintiffs identified above may not maintain negligence claims for non-economic damages, these Plaintiffs' negligence claims are for purely economic damages. "For a plaintiff to recover in those circumstances, the plaintiff would have to show some source of duty outside the common law of negligence, such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." *Id*., brackets, quotation marks, and citation omitted; see also *Numrich v. Ntekpere*, Case No. 12-cv-1594-HU, 2013 U.S. Dist LEXIS 14792 (D. Or. 2013); *McFarlin v. Gormley*, 2008 U.S. Dist. LEXIS 10541 (D. Or. 2008).

---

[7] By contrast, two of the Plaintiffs (Kotrous and Ottens) assert repeated sexual assaults. In light of the decision in *Wilson v. Tobiassen*, 97 Or. App. 527, 532 (1989) (repeated sexual molestation of minor boy scout satisfied physical impact rule), Goldstar does not assert that the physical impact rule for these two Plaintiffs was not satisfied at the pleading stage.

A mere employment relationship does not create the "special relationship" necessary to overcome the economic loss rule. *Conway v. Pacific University*, 324 Or. 231, 236 (1996); *see also Numrich v. Ntekpere*, 2013 U.S. Dist. LEXIS 14792, *11 ("As a matter of law, an employee-employer relationship is not one in which the employer has a 'duty' to pursue the interests of its employees"). In other words, an employer-employee "relationship is not a special relationship able to support a negligence claim for purely economic damages." *Numrich*, at *9, citing *McFarlin v. Gormley*, No. CV-06-1594-HU, 2008 WL 410104, at *15 (D. Or. Feb 12, 2008).

Here, five Plaintiffs (Kelsey, Noonan, Robertson, Suggs, and Wickler) seek economic damages without any accompanying physical injury or property damages. Under the economic loss doctrine, their claims are barred because they do not plead facts which might give rise to a finding of a "special relationship." Plaintiffs allege that their employment created a duty, but as set forth above, an employer-employee relationship is not sufficient to support a negligence claim for purely economic damages. Therefore, Plaintiffs cannot seek to recover economic damages under their negligence claims, and these claims must be dismissed.

## V.    CONCLUSION

Plaintiffs' attempts to transform their employment claims into trafficking or negligence claims should be rejected, and those claims (1-4 and 7) should be dismissed with prejudice. Plaintiffs essentially claim that they suffered severe sexual harassment while employed at Goldstar. Their allegations are squarely addressed and governed by the employment discrimination statutes: ORS 659A.030; 42 U.S.C. §§ 2000e, et seq. Some Plaintiffs may have their claims for sex discrimination barred by a statute of limitations, but that does not validate unsupported claims for slavery or justify ignoring the workers' compensation laws, the elements of negligent infliction of emotional distress, or the economic loss rule.

Respectfully Submitted,

GORDON & REES LLP

/s/ Daniel J. Nichols
Christopher E. Hawk, OSB # 061635
Daniel J. Nichols, OSB #101304
Kjersten Turpen, OSB # 025920
*Counsel for Defendant Goldstar Estate Buyers Corporation*

Dated: June 2, 2014