Christopher E. Hawk, OSB # 061635
chawk@gordonrees.com
Daniel J. Nichols, OSB #101304
dnichols@gordonrees.com
Kjersten Turpen, OSB # 025920
kturpen@gordonrees.com
Gordon & Rees LLP
121 SW Morrison St., Suite 1575
Portland, OR  97204
Telephone:  (503) 222-1075
Facsimile:  (503) 616-3600

Attorneys for Defendant
Goldstar Estate Buyers Corporation


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **KELLY KELSEY, CHRISTINE KOTROUS, LINDA NOONAN, CHRISTINE OTTENS, RITA ROBERTSON, KARYN SUGGS and SHERRY WICKLER,**<br><br>                        Plaintiffs,<br><br>         vs.<br><br>**GOLDSTAR ESTATE BUYERS CORPORATION, a Minnesota corporation, and WILLIAM ULRICH, an individual,**<br><br>                        Defendants. | Case No.  3:13-cv-00354-HU<br><br>**DEFENDANTS GOLDSTAR ESTATE BUYERS CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>**Fed. R. Civ. P. 12(b)(6)**<br><br>**Request for Oral Argument** |

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION                                                                1

II. ARGUMENT                                                                   2

   A.   Plaintiffs must allege                                           2
       facts to support conclusions

      1. Plaintiffs may not rely upon facts not alleged in          2
         the Second Amended Complaint

      2. Plaintiffs may not rely upon conclusions                   3
         unsupported by factual content

   B.  Plaintiffs have not alleged facts giving rise to                4
      claims for forced labor, trafficking, and
      involuntary servitude

      1.   Harassment and assault are not the equivalent       5
          of slavery

      2.   None of the Plaintiffs stated a claim for           7
          trafficking or slavery

          a.   Kelsey                                          7
          b.   Noonan                                          8
          c.   Kotrous                                         8
          d.   Ottens                                          10
          e.   Robertson                                       11
          f.   Wickler                                         11

   C.  Plaintiffs' negligence claims are precluded by the              13
      Workers' Compensation exclusivity clause

      1.   Plaintiffs misapprehend the scope of the            13
          Workers Compensation exclusivity clause

                                                                        Page No.

        2.  Plaintiffs' claims stem from their                            15
            employment relationship

    D.  In the alternative, certain Plaintiffs'                           16
        claims for negligence must be dismissed

        1. Four Plaintiffs have not alleged an                            16
           adequate physical impact to recover
           emotional distress damages under a
           negligence theory

        2. An employee manual does not give                               18
           rise to a special relationship allowing
           a claim for purely economic damages

III. CONCLUSION                                                           19

# I.    INTRODUCTION

Goldstar's motion to dismiss should be granted in its entirety. As to the first four claims, Plaintiffs' Response fails to address the singular deficit in their pleadings: Plaintiffs do not allege that they were forced to remain employed at Goldstar. They allege that they were harassed, threatened, even assaulted (as to some Plaintiffs) while employed at Goldstar. But Plaintiffs do not allege that any of the harassment, threats, or assaults were used to coerce them to continue working for Goldstar. Indeed, Plaintiffs allege the opposite: they feared termination of their employment if they did not accept their allegedly poor treatment. Plaintiffs' argument overlooks the critical element required for a claim of slavery or trafficking:

> [S]omeone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not **continue to work**, she will suffer the type of serious harm — physical or nonphysical, including psychological, financial, reputation harm — that would compel someone in her circumstances **to continue working to avoid that harm**.

*U.S. v. Dann*, 652 F.3d 1160, 1169-1170 (9th Cir. 2011) (bold added). Plaintiffs have simply failed to allege any facts to state a plausible case that they were compelled to continue working at Goldstar.

In addition, Plaintiffs' negligence claims must be dismissed as they are preempted by the workers compensation exclusivity provisions because the allegations make clear any alleged harm arose out of Plaintiffs' employment. In the alternative, Plaintiffs Noonan, Robertson, Kelsey, and Wickler's negligence claims must be dismissed because they do not allege any physical impact sufficient to seek non-economic damages, and may not proceed in negligence for purely economic losses. Plaintiffs concede Noonan

and Robertson do not allege a physical impact. As Kelsey and Wickler suffer the same

flaw, all four Plaintiffs' negligence claims must be dismissed because they cannot

proceed with negligence for purely economic loss without some heightened duty; an

employee handbook cannot give rise to some heightened duty sufficient to overcome this

rule.

## II.   ARGUMENT

### A.   Plaintiffs must allege facts to support conclusions.

As an initial matter, Plaintiffs' Response brief does not respect the confines of the

record on a motion to dismiss. It therefore suffers from two foundational defects:

(1) Plaintiffs attempt to rely on facts not pleaded in the Second Amended Complaint, and

(2) Plaintiffs continue to rely upon vague conclusions rather than well-pleaded facts. All

of the actual facts alleged in Plaintiffs' Second Amended Complaint have been addressed

by Defendants' briefs. Plaintiffs cannot defeat Defendants' motions on facts that were not

pleaded in the operative complaint.

### 1.   Plaintiffs may not rely upon facts not alleged in the Second Amended Complaint.

"[F]or a complaint to survive a motion to dismiss, the non-conclusory factual

content, and reasonable inference from that content must be plausibly suggestive of a

claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th

Cir. 2009). A plaintiff may not rely on factual content that is not contained in the

operative complaint. *Id.*

Plaintiffs attempt to do just that in opposing the Motion to Dismiss. For example, in their Response, Plaintiffs assert that they "have very little money and, when they were on Goldstar business trips, relied entirely on Defendants to provide food and lodging." Response at 20. Those allegations are simply not in their Second Amended Complaint. Plaintiffs make no assertion as to their wealth or poverty in the Complaint. And while Plaintiffs allege that "Defendants paid for employees' food and lodging in the various cities in which Defendants were conducting their business," Plaintiffs do not allege that they had no other access to food or lodging. SAC, ¶ 3. A company paying for lodging and food on a business trip does not, on its own, suggest slavery-like conditions.

### 2.    Plaintiffs may not rely upon conclusions unsupported by factual content.

In granting Defendants' first motion to dismiss, this Court held that Plaintiffs' general and conclusory "allegations [were] deficient" because "[t]hey do not allege facts." Order (Doc No. 36), p. 11. The Court instructed Plaintiffs that they needed facts to support their conclusions:

> Whether [Plaintiffs' Complaint] is ultimately sufficient to state a claim, it will only be so if sufficient factual allegations are made of the actual exercise of force, the threats made of the potential use of force, the physical restraints used or threatened, and what serious harm actually befell Plaintiffs or was threatened in **sufficient detail to demonstrate a violation** of the statutes relied upon.

March 21, 2014 Order (Doc. 36), p. 11 (bold added). Notwithstanding this instruction, Plaintiffs continue to rely upon general conclusions devoid of factual content. For example, Plaintiffs assert that to "acquire Kelsey's compliance with his efforts to inflict forced sex on her, Ulrich used threats of serious harm, including physical harm,

withholding food ..." Response at p. 20, citing SAC ¶¶ 70, 192(d). Plaintiffs allege no facts to support these broad, conclusory statements, which are paraphrases of the underlying statutes. See SAC at ¶¶ 8-18 (Kelsey's factual allegations). Plaintiffs' Response brief is replete with references to these kinds of conclusory allegations, all of which may (and should) be ignored.

**B.      Plaintiffs have not alleged facts giving rise to claims for forced labor, trafficking, and involuntary servitude.**

Rather than address the deficiencies in their Complaint, Plaintiffs attempt to set up a straw man of Defendants' argument. Defendants do not contend, as Plaintiffs claim, that a plaintiff must have been chained up to state a claim for involuntary servitude. Response at 17. Defendants do not dispute that forced labor can result from psychological coercion, such as the fear of withheld necessities of life, or abuse of legal process, such as threats of deportation. However, to establish liability, the threat of serious harm must be used to "compel someone in [a plaintiff's] circumstances to continue working to avoid that harm." *U.S. v. Dann*, 652 F.3d 1160, 1169-1170. In other words, the TVPA and Oregon statutes must be construed to address slavery, rather then stretched to cover any poor working environment. The opinions cited by Plaintiffs are in accord. In *David v. Signal* (cited at page 16 of Plaintiffs' Response), the court emphasized the need to be cautious about the potentially broad reach of the TVPA and to restrict its application to where the defendant's conduct is "the driving force behind the victim's 'choice' to render the labor." *David v. Signal Int'l, LLC*, 2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 3, 2012). Additionally, "the victim's response to the defendant's actions must pass the

reasonable person test. The reasonable person test injects an objective standard into the forced labor determination ..." *Id.* When Plaintiffs' factual allegations—as opposed to their legal conclusions—are examined, with this standard in mind, they do not allege a plausible claim for forced labor or trafficking.

### 1.   Harassment and assault are not the equivalent of slavery.

Plaintiffs attempt to overstate the reach of the involuntary servitude statute. In responding to Defendant Ulrich's argument that forced sex is not covered by the forced labor statutes, Plaintiffs suggest that any sexual assault (or "forced sex") is compensable under the slavery and trafficking statutes. Response at 21, 23. Plaintiffs therefore make no distinction between being assaulted and being enslaved.

For example, Plaintiffs cite as the "most egregious example" of Goldstar's alleged trafficking and enslavement of Plaintiff Kelsey, Ulrich's attempt to "approach[] Kelsey for a kiss, which she resisted." Response at 20, citing SAC ¶ 17-18 ("Ulrich then followed her into a hotel bathroom and tried to physically force himself on her by trying to kiss and fondle her.") Based on those allegations, Kelsey was not enslaved; she was (at most) harassed. The trafficking/force labor statutes cannot be stretched to encompass this kind of harassment.

Assuming, arguendo, that forced sex can be a "service" under the trafficking and forced labor statutes, that does not mean that every assault—sexual or otherwise—is, by definition, slavery. Rather, the assault itself must be used to maintain control over a person's choice to continue working. For example, in *U.S. v. Todd*, the criminal defendant Todd "laid down rules" for his victims to obey, and the paramount rule was

that they could not leave his control. 627 F.3d 329, 331. Todd enforced his rules through

physical violence (including beating his victims "from head to toe") and through

psychologically breaking his victims. *Id*. In other words, Todd assaulted his victims in

order to keep them under his control. The assaults themselves were not the enslavement;

rather, the assaults were used to maintain Todd's control.

By contrast, in *Headley v. Church of Scientology*, the plaintiffs "experienced and

observed ... physical abuse while in the Sea Org." 687 F.3d 1173, 1176 (9th Cir. 2012).

"A senior Scientology executive physically struck [one of the plaintiffs] on two occasions

and another official punched him on another occasion." *Id*. And both plaintiffs in

*Headley* "saw senior Scientology leaders physically abuse other staff." *Id*. Nevertheless,

the court concluded that the physical abuse cited by the plaintiffs was "not of the type

that caused them to continue their work and to remain with the Sea Org." *Id*. at 1180.

Therefore, they could not state claims for forced labor under the TVPA.

Like *Headley*, Plaintiffs in this case do not allege that any of Ulrich's assaults or

harassment was used to keep them working for Goldstar. Plaintiffs do not allege that they

attempted to leave and could not. Indeed, Plaintiffs were apparently afraid of being

dismissed from Goldstar. They fail to plausibly state a claim that they were compelled to

remain at Goldstar and provide services.

It is well understood that employers maintain control (to some extent) over their

workplaces. That control is not the equivalent of enslavement. Further, it is (sadly)

known that some workplaces are home to harassment, even assaults, of employees.

Again, that does not turn those workplaces into places of enslavement. *U.S. v. Dann*, 652

F.3d 1160, 1170 ("To be sure, not all bad employer-employee relationships ... will constitute forced labor.") The critical requirement for stating a claim under the TVPA (or similar Oregon statutes) is that the aggrieved employee must be compelled to continue working to avoid serious harm. *Id.* Plaintiffs have simply not pleaded facts to satisfy that critical requirement.

### 2.   None of the Plaintiffs stated a claim for trafficking or slavery.

Addressing Plaintiffs' factual allegations one by one, it becomes clear that none of the Plaintiffs have stated a plausible claim for human trafficking or slavery.

#### a.   Kelsey

Plaintiff Kelsey has not stated a claim for forced labor or trafficking. In their Response, Plaintiffs regurgitate the general conclusory statements in their Second Amended Complaint. Response at 19, citing SAC ¶¶ 70, 192(d). Plaintiffs fail to articulate any well-pleaded facts to support Kelsey's general allegations of physical harm, etc. Plaintiffs have not followed the Court's instruction to allege **facts** regarding "the actual exercise of force, the threats made of the potential use of force, the physical restraints used or threatened, and what serious harm actually befell Plaintiffs or was threatened in sufficient detail to demonstrate a violation of the statutes relied upon." March 21, 2014 Order (Doc. No. 38), p. 11.

As to trafficking, Ulrich allegedly "suggested that Kelsey could receive money in exchange for having sex with him, and once expressly offered her $100,000 in exchange for having sex with him." Response at 20. However, suggesting sex in exchange for money is not sex trafficking as defined by the TVPA. *See U.S. v. Todd*, 627 F.3d 329,

335 (Smith, J., concurring) ("Where a defendant engages in sex trafficking without the use of force, fraud, or coercion, or where children are not involved, his conduct is criminalized by a different set of statutes.") Again, Plaintiff Kelsey fails to offer any factual allegations to support the general and conclusory statement that "Defendants used the same coercive tactics and threats of serious harm that they did with respect to the involuntary servitude and forced labor claims." Response at 20. In short, Plaintiff Kelsey has not alleged facts to state a plausible claim for forced labor, involuntary servitude, or trafficking.

### b. Noonan

Noonan's only factual allegations relate to a single Goldstar show during with Ulrich allegedly refused to let her eat dinner. SAC, ¶¶ 31-32. Based on that incident, Noonan attempts to state that she was enslaved and trafficked. Plaintiffs acknowledge the questions raised by Defendants (why—when Ulrich refused to allow her to eat—Noonan did not simply buy her own food or return home (Response at 19)), but Plaintiffs fail to answer that critical query with factual allegations in the Complaint. Plaintiff Noonan utterly fails to state a plausible claim for coercion by threat of serious harm to engage in commercial sex.

### c. Kotrous

Kotrous attempts to compare her situation with that of vulnerable foreign immigrants threatened with deportation. That comparison fails on several counts. In *U.S. v. Dann* (the "most important case for this Court to consider" according to Plaintiffs (Response at 5)), an American homeowner took her Peruvian housekeeper's passport and

used threats of deportation, psychological abuse, and fraud to keep the housekeeper in slavery-like conditions for two years. 652 F.3d 1160, 1162. The Peruvian housekeeper was "fearful of what would happen if she were to leave." *Id.* at 1163. Likewise, in *Garcia v. Curtright* (cited by Plaintiffs), the defendant "forced plaintiff and her family to care for his mother 24 hours a day in plaintiff's home," by threatening to use political connections to "deport plaintiff and her family if she continued to complain." 2012 U.S. Dist. LEXIS 70454, *2-3 (D. Or. May 17, 2012).

The deportation cases are all distinguishable from this case because the unique power dynamic and circumstances of an American threatening a foreign national—who may have no other means of support, may not understand the legal system, and may not speak the language—do not exist in this case. Plaintiffs were all American citizens. None of the Plaintiffs had their passports taken or were threatened with either deportation or being stranded in a foreign country. Plaintiffs fail to allege any coercion to attend the "Goldstar business trips," other than the desire to remain employed. Response at 20. Plaintiffs recognize that a threat of deportation can be sufficient to coerce involuntary servitude because that threat compels "the plaintiff to provide labor or services." Response at 18. But Plaintiffs fail to connect that lesson to their claims. The question remains unanswered: what prompted Plaintiffs to keep returning to Goldstar shows to provide labor or services? According to Plaintiffs, it was the threat of losing their jobs rather than a "serious harm" as defined by the statutes at issue.

Kotrous alleges that she drank heavily with Ulrich, in violation of her parole requirements. SAC, ¶ 26. (Kotrous also alleges that Ulrich "forced" her to drink alcohol,

but fails to identify how Ulrich forced her to drink.) Additionally, Kotrous feared the consequences of violating her parole, but that fear does not constitute an abuse of legal process. In applying the statutes at issue, "we must distinguish between 'improper threats or coercion and permissible warnings of adverse but legitimate consequences.'" *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180.

More fundamentally, Kotrous does not allege that the alleged threats to report her parole violations were used to keep her at Goldstar. Rather, Plaintiffs vaguely allege that Ulrich threatened to report Kotrous "if she did not obey him." SAC ¶ 26. Plaintiffs fail to outline the requirements of that alleged obedience. Kotrous' more specific factual allegations make it clear that she was able to leave Goldstar. Indeed, she left Goldstar's employment at least nine times during her sixteen months of employment. SAC, ¶ 22. While Kotrous alleges that Ulrich sexually assaulted her on various occasions, she does not allege that the assaults were used to keep her employed at Goldstar. Rather, Kotrous complains that she was "sent home" if she did not comply with Ulrich's advances. SAC, ¶¶ 27-28.

### d.  Ottens

Ottens alleges that she was raped, drugged, and threatened with firing "if she did not comply with [Ulrich's] sexual demands." Response at 22. This begs the question: Why did she continue working for Goldstar? Plaintiffs do not answer this critical question. Rather, Plaintiffs simply conclude that because "forced sex is squarely within Oregon's involuntary servitude and the forced labor statute," the alleged assaults and threats to fire Ottens constituted slavery and trafficking. Response at 22. In so arguing,

Plaintiffs improperly conflate horrific working conditions with enslavement. Plaintiffs

have not alleged that Ottens could not leave her employment at Goldstar. Indeed, Ottens

quit Goldstar immediately after her alleged drugging and sexual misconduct by Ulrich

during her first period of employment with Goldstar. SAC, ¶¶ 37-38. She then rejoined

Goldstar three years after this alleged incident. SAC, ¶ 38. While Ottens alleged a

significant amount of harm and threats of harm while working at Goldstar, she has not

alleged that she was compelled to "continue working to avoid that harm." *See U.S. v.*

*Dann*, 652 F.3d 1160, 1170.

### e. Robertson

In their Response, Plaintiffs identify two incidents that, Plaintiffs assert, constitute

the enslavement and trafficking of Robertson. First, Ulrich allegedly (unsuccessfully)

attempted to enter Robertson's hotel room to assault her. Response at 22. Second, Ulrich

"compelled Robertson to watch him having sex with prostitutes by threatening to send

her home from the gold show and thereby causing her financial harm." Response at 23.

That is the opposite of forced labor or involuntary servitude. Robertson does not allege

that she was **compelled to** remain at Goldstar. Rather, Robertson alleges she put up with

alleged sexual misconduct **in order** to remain at Goldstar.

### f. Wickler

In her Second Amended Complaint, Wickler alleges that "Ulrich's sexual

harassment" began "within the first week of her employment in 2004." SAC, ¶ 59.

Wickler alleges that Ulrich "would yell at her and threaten to fire her." SAC, ¶ 59. This

harassment and threats to fire Wickler, along with the unspecified "verbal abuse" and

throwing of objects, was allegedly directed at obtaining Wickler's consent to sex. SAC,

¶ 59. It was not, however, apparently directed at keeping Wickler at Goldstar. Rather, she

feared dismissal from Goldstar. As with the other Plaintiffs, Wickler is missing the

critical element for involuntary servitude: serious threats of harm that compelled her

"continue working to avoid that harm." *See U.S. v. Dann*, 652 F.3d 1160, 1170. And like

the other Plaintiffs, Wickler has not alleged a plausible claim for involuntary servitude or

forced labor.

Wickler asserts liability under ORS 163.263(d) for attempting to collect an

unlawful debt, based upon the allegation that Ulrich "loaned Wickler money for cosmetic

surgery in exchange for sex. He later demanded sex from Wickler as payment for alleged

interest that he claimed she owed him on this loan." Response at 23, SAC, ¶ 63.

However, when both the complaint and the statute are read in their respective contexts,

this claim falls short of plausibility. The Oregon forced labor statute is based upon *forced*

labor, not labor that is requested, asked for, or even demanded. The collection of the

unlawful debt must be sufficiently coercive to force the plaintiff to provide services. ORS

163.263. For example, in *U.S. Dann*, the American homeowner was guilty of forcing her

Peruvian housekeeper into involuntary servitude by, among other things, threatening to

collect on a $7,000 debt if the housekeeper attempted to leave. *U.S. v. Dann*, 652 F.3d

1160, 1165. In this case, there are no well-pleaded facts demonstrating that Wickler was

*forced* to provide services as a result of Ulrich's alleged demand for sex. Wickler has not

pleaded facts demonstrating the serious harm that would allegedly result if she had left

Goldstar. Indeed, one of her fears was that she would be dismissed from Goldstar. SAC,

¶¶ 59, 61 ("Ulrich told Plaintiff Wickler to find him other sex partners or she should be fired"). Wickler has not alleged facts that state an objectively reasonable case for forced labor or involuntary servitude.

**C.   Plaintiffs' negligence claims are precluded by the Workers' Compensation exclusivity clause.**

**1.   Plaintiffs misapprehend the scope of the Workers Compensation exclusivity clause.**

Plaintiffs attempt to rely on questionable case law to narrow the scope of the workers compensation exclusivity bar. Plaintiffs' reliance is misplaced. Plaintiffs argue that they suffered injuries which are "wholly unconnected to Plaintiffs' employment." Response at 25. In so arguing, Plaintiffs rely heavily on *Carr v. US West,* 98 Or. App. 30, 779 P2d 154, *rev. den.* 308 Or. 608, 784 P2d 1101 (1989). The Oregon Court of Appeals relied on *Carr* in its opinion in *Redman Industries, Inc. v. Lang,* 142 Or. App. 404, 921 P.2d 992 (1996). On review, the Oregon Supreme Court reversed the Court of Appeals' decision in *Redman,* and held that "an injury arises out of employment if the risk of injury results from the nature of the claimant's work or from the work environment." *Redman,* 326 Or at 39. Thus, as set forth in *Goodman-Herron v. SAIF Corp.,* 151 Or. App. 602, 608, 950 P.2d 932 (1997), "in the absence of evidence showing that the motivation for the assault was personal to the claimant, and accordingly, imported into the work environment, 'the risk of an assault by a coemployee in the workplace is a risk to which the work environment exposes an employee.'"

Plaintiffs also cite to *Panpat v. Owens-Brockway Glass Container, Inc.,* 334 Or. 342, 349, 49 P.3d 773 (2002), which is in accord. In *Panpat,* the plaintiff was killed by

her boyfriend (who happened to be a co-worker) at their shared place of employment. The court noted that the motivation for the killing was purely personal and the workplace was merely an available setting to commit the crime. Therefore, the injury did not arise in the course of her employment. Rather, it was a harm that happened to occur in the workplace due to incidents occurring entirely outside the workplace.

Plaintiffs argue that *Von Heeder v. Safeway,* is unhelpful to Defendants. Defendants disagree, and note that in that opinion, the court **agreed** that the plaintiffs there appropriately agreed to dismiss their negligence claims given the court's opinion in *Hanson v. Versarail Systems, Inc.,* 175 Or. App. 92, 28 P.3d 626 (2001). Plaintiffs assert that "notably" the court held that workers compensation exclusivity was not a bar to the plaintiff's sexual harassment claims. This is not particularly notable for our purposes, as Defendants have not moved to dismiss Plaintiffs' intentional claims on workers compensation preemption grounds, only the negligence claims. Plaintiffs' argument that *Hanson* is inapplicable where the plaintiff alleged the employer was directly liable for the harassment misunderstands the court's opinion. The court was simply noting that an employee may not assert the workers compensation bar as a defense to an intentional theory of liability.

Finally, this court's opinion in *Pearson v. Reynolds Sch. Dist. #7,* 2013 U.S. Dist. LEXIS 185436 at *55 (D.Or. 2013), is instructive, in that the opinion makes clear that the workers compensation system is the exclusive remedy for a claim for negligence arising out of workplace conduct, such as alleged herein.

### 2.   Plaintiffs' claims stem from their employment relationship.

Plaintiffs' attempt to argue that their alleged harm was the result of risks "wholly unconnected" to their employment is flatly contradicted by their own allegations. Indeed, Plaintiffs' Second Amended Complaint is entirely premised on the theory that their alleged injuries were directly related to their employment. Plaintiffs allege that "Defendants [Goldstar *and* Ulrich] subjected each plaintiff to unlawful sex-based conduct as part of a pattern of recruiting and hiring vulnerable female employees." SAC ¶ 5. Further, Plaintiffs allege "Defendants [Goldstar *and* Ulrich] exploited these employees to obtain both their labor and sexual gratification for Defendant Ulrich." SAC ¶ 5. In contrast with *Panpat*, Plaintiffs do not allege that Goldstar was merely a convenient venue for Ulrich's alleged harassment and assaults that were wholly "imported into the employment from [their] domestic or private life." *See* 334 Or. 342, 350. Rather, Plaintiffs allege that the alleged harassment and assaults were the result of "circumstances associated with [their] work environment." *See Redman Indus. v. Lang*, 326 Or. 32, 40 (1997).

As set forth in Defendant Goldstar's opening memorandum, all of Plaintiffs' allegations of negligent injury arise out of each of their employment relationships with Goldstar. As such, Plaintiffs' negligence claims are barred by the workers' compensation exclusivity provision, and must be dismissed.

**D.    In the alternative, certain Plaintiffs' claims for negligence must be dismissed.**

**1.    Four Plaintiffs have not alleged an adequate physical impact to recover emotional distress damages under a negligence theory.**

Plaintiffs agree that the general rule in Oregon requires a plaintiff to have suffered a physical impact in order to recover emotional distress damages under a negligence theory. Plaintiffs argue that Kelsey and Wickler, like Kotrous and Ottens, have sufficiently alleged physical impact to allow them to proceed in their claims for emotional distress under a negligence theory. Plaintiffs thus appear to concede that Plaintiffs Noonan and Robertson do not allege a physical impact sufficient to seek emotional distress damages (and cannot recover for solely economic loss) such that their claims for negligence should be dismissed.

Plaintiffs argue that Kelsey and Wickler have adequately pled a physical impact, pointing to the allegations that each alleged an "assault" and "unwanted touching of a sexual nature." Response at p. 27. However, as set forth in Goldstar's opening brief, not every physical touch can satisfy the physical injury rule. *Chouinard v. Health Ventures*, 179 Or App 507, 515. "At a minimum, the physical impact rule requires an act or omission that results in some perceptible physical effect on a plaintiff." *Id.* The allegations that Kelsey and Wickler suffered an "assault" or "unwanted touching of a sexual nature" do not sufficiently allege that an act occurred which resulted in some perceptible physical effect on either Plaintiff Kelsey or Wickler.

The cases cited by Plaintiffs do not alter the analysis. In *Wilson v. Tobiassen,* 97 Or App 527, 532 (1989), the defendants did not contest that a physical impact had been

alleged, after trial of the claims, where the defendant boy scout leader had sexually molested minor children. In *Shoemaker v. Management Recruiters Int'l,* 125 Or App 568, 573 (1993), the plaintiff alleged that the defendant "intentionally touched plaintiff's wife without her consent on her breast with his hands, on her neck with his genitalia and on her body with his emission" and that this offensive touching caused the plaintiff severe emotional distress.

Plaintiffs' allegations here stand in stark contrast to those in *Shoemaker* and *Wilson.* Neither Kelsey nor Wickler allege the specific type of physical contact which allegedly resulted in severe emotional distress. They merely allege, in conclusory fashion, that an assault occurred, and some unwanted touching of a sexual nature occurred. No detailed allegations of the type of physical impact have been offered. While Plaintiff Kelsey alleges detail relating to incidents which she alleges occurred between herself and Defendant Ulrich, she does not allege any specific incident where he touched her or otherwise caused any physical impact to occur. Similarly, Plaintiff Noonan alleges details regarding what Defendant Ulrich allegedly said to her, but does not allege any physical impact occurred. Plaintiff Robertson alleges Defendant Ulrich said a number of things to her, but does not allege any instances of physical impact. Finally, Plaintiff Wickler alleges various conduct by Defendant Ulrich, but does not allege any specific physical impact. None of these four Plaintiffs allege any facts supporting a finding that she suffered any physical impact. As such, these four Plaintiffs cannot proceed in a negligence claim for emotional distress damages, and are left with a claim for economic losses only.

### 2.   An employee manual does not give rise to a special relationship allowing a claim for purely economic damages.

Plaintiffs argue that they have stated claims for negligence, regardless of physical impact, because Defendants allegedly breached a duty created by their Employee Manual. Even if Defendants owed Plaintiffs a duty because of the Employee Manual as alleged, Plaintiffs may not state a claim for negligence for purely economic loss absent the existence of some heightened duty. Plaintiffs do not direct the court to any case law supporting the proposition that an employee manual can create the type of heightened duty required to pursue a claim for economic damages. To the contrary, as set forth in Goldstar's opening memorandum, courts have held that an employer-employee relationship is not the type of special relationship that allows a negligence claim for purely economic loss. Thus, Plaintiffs Kelsey, Wickler, Noonan, and Robertson cannot proceed under a negligence theory here.

None of the cases cited by Plaintiffs address the argument that the claims were not permitted to proceed because the plaintiffs were pursuing only economic damages. In *Burnett v. Ross Stores,* 857 F. Supp. 1434 (1994), the court there allowed the negligence claim to proceed without evaluating or considering the economic loss rule, and did not hold that an employee handbook could give rise to a heightened duty between two parties. While an employee handbook might establish a duty between two parties, it does not establish a special relationship allowing a negligence claim for purely economic damages.

In *Loosli v. City of Salem,* 215 Or App 502, 170 P3d 1084 (2007), also cited by Plaintiffs, the court set forth the requirement of a special relationship to proceed in a negligence claim for purely economic damages. The court did not find a special relationship was created by an employee handbook, as that question was not before it. Finally, Plaintiffs cite to *Koanui v. Cenveo Corp.,* 2004 U.S. Dist. LEXIS 24298 (D. Or. 2004). In *Koanui,* Judge Coffin declined to grant a motion to dismiss a negligence claim based upon a duty allegedly owed pursuant to terms in an employee handbook. Judge Coffin was not presented with the question whether the plaintiff could proceed in a negligence claim for purely economic damages or whether the employee handbook gave rise to a special relationship sufficient to assert such a claim. As set forth in Goldstar's opening memorandum, the case law is clear that a defendant is only liable for negligently causing another's purely economic loss where a special relationship exists, and an employer-employee relationship is not the type of special relationship giving rise to such a claim. Plaintiffs Kelsey, Wickler, Noonan, and Robertson's claims for negligence must be dismissed.

### III.   CONCLUSION

Plaintiffs allege that they put up with pervasive and appalling sexual harassment in order to keep their jobs at Goldstar. Such allegations could be the basis for sexual harassment claims (and three Plaintiffs have asserted such claims). But the scenario that Plaintiffs describe is, by definition, not involuntary servitude or trafficking. Plaintiffs allege that they continued to work at Goldstar in spite of the harassment, not as a result of it. Therefore, Plaintiffs' Claims 1-4 should be dismissed with prejudice in their entirety.

Likewise, Plaintiffs' negligence claims are barred because they assert compensable claims under the workers compensation system stemming from their work environment. At a minimum, four of the Plaintiffs' negligence claims fail because they do not allege the requisite physical impact to recover damages under a negligence theory. Goldstar's motion should be granted in its entirety.

    Respectfully submitted,

July 11, 2014                              GORDON & REES LLP

                                          /s/ Daniel J. Nichols
                                          Christopher E. Hawk, OSB # 061635
                                          Daniel J. Nichols, OSB #101304
                                          Kjersten Turpen, OSB # 025920
                                          Counsel for Defendant Goldstar Estate
                                          Buyers Corporation